**Charles D. OLSON, Appellant,**

v.

**AIC/MARTIN J.V., and Employers Casualty Co., Appellees.**

**No. S–3670.**

Supreme Court of Alaska.

June 7, 1991.

Rehearing Denied July 18, 1991.

---

Michael J. Jensen, Anchorage, for appellant.

Shelby L. Nuenke–Davison, Davison & Davison, Inc., Anchorage, for appellees.

Before RABINOWITZ, C.J., BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

## INTRODUCTION

Charles Olson appeals the Alaska Workers' Compensation Board's ("Board") deci-

sion, as affirmed by the superior court, terminating his temporary total disability ("TTD") benefits, denying him vocational rehabilitation and various continuing medical costs, and applying AS 23.30.145(b) to his request for attorney's fees.

## FACTS

Charles Olson was injured on July 29, 1985, while working as a heavy duty tireman for AIC/Martin, J.V. ("AIC/Martin") in Prudhoe Bay. He was operating a tire boom truck when the tire slipped, forcing his arm into the controls. He was squeezed between the tire boom and tire until losing consciousness, when he was rescued by a co-worker. At the time of injury, his average weekly wage was $797.92. Olson received TTD benefits at a weekly rate of $489.33 from July 30, 1985 until February 23, 1988.

Olson believed he could not return to heavy duty tireman work due to his 1985 injury. AIC/Martin referred Olson to rehabilitation services in September 1986. A fifty week vocational rehabilitation plan was drafted in January 1988, to prepare Olson for the position of auto service technician. This type of employment would have given Olson an anticipated wage of approximately $15.60 per hour. Olson did not pursue this plan.

In the interim, since he believed other alternatives did not exist, Olson organized a tire retreading business in June 1986. The business, Olson's Precision Retreading, was owned by Olson's father. The business differed from a typical retread shop in that it handled only passenger and light truck tires and its procedures were modified to account for Olson's physical limitations.[1] Since December 1986, Olson has been an "organizer, supervisor, teaching everybody how to do the job." He works between forty and seventy hours a week. Olson currently receives no compensation, but he keeps track of his time so he can use it in future negotiations in purchasing the business from his father.

---

1. The heaviest object that retreaders at Olson's shop have to lift is seventy-five pounds.

Olson has seen many doctors about the continuing health problems he attributes to his injury. His chief complaints have been

1) Stabbing and burning pain in the left shoulder, associated with numbness extending into the left upper extremity and to the small, ring, and long fingers.

2) Headaches, pounding type, extending from the interscapular region to the posterior aspect of his neck, to the left side of his head, and eye.

3) Numbness in the toes of the left foot present when the fingers become numb.

In April 1987, the Objective Medical Assessment Corporation conducted an independent medical review for AIC/Martin's insurance carrier. The Medical Assessment Corporation found evidence of an untreated rotator cuff tear and untreated left carpal tunnel syndrome. It recommended the claim remain open for continued orthopedic treatment. In January 1988, Orthopaedic Panel Consultants, on behalf of AIC/Martin, conducted another independent medical evaluation of Olson. The report of Orthopaedic Panel stated, "1) Claimant is medically and vocationally stationary. 2) No further treatment is indicated. 3) Claimant has been released for regular work, and some specific jobs. 4) Claimant has been working in a family business since October of 1986, and is vocationally stationary."

On February 11, 1988, Olson filed an adjustment of claim for continuing medical care. AIC/Martin filed a controversion notice concerning benefits for TTD, TPD (temporary partial disability), PPD (permanent partial disability), current medical treatment, and vocational rehabilitation.

At the hearing on Olson's claim, the Board heard evidence and examined depositions and reports from numerous doctors. The Board also considered various labor reports. In particular, David Tydings, a vocational rehabilitation counselor from Comprehensive Rehabilitation Services, Inc. ("CRS"), testified at the hearing. He testified that Olson had returned to suitable gainful employment as a supervisor/manager and that Olson would not benefit from additional vocational rehabilitation. Tydings further stated that the auto service technician position would not place Olson in a better position economically than what he had achieved in retraining himself.

The Board held that Olson was not entitled to TTD benefits, vocational rehabilitation benefits, or continuing medical benefits, except for treatment of the left shoulder rotator cuff injury. Olson had sought continuing medical benefits for his cervical spine, carpal tunnel syndrome, and leg numbness, which were denied because the Board "received no evidence linking" these symptoms "to the 1985 injury." The Board also denied AIC/Martin's request for a compensation rate reduction. The Board retained jurisdiction to determine the reasonableness of Olson's attorney's fees request for defeating the employer's compensation rate reduction claim, although it held it would determine those fees under AS 23.30.145(b).[2]

The superior court affirmed the Board's decision, holding there was substantial evidence to support the Board's rulings. The superior court approved the Board's application of AS 23.30.145(b) for attorney's fees, but concluded that the reasonableness of the fee award was not ripe for review.

## DISCUSSION

### I. TEMPORARY TOTAL DISABILITY BENEFITS

#### A. *The Presumption of Compensability*

The Board found that Olson was capable of working as a tire shop manager and a tire retread shop manager and therefore

---

**2.** AS 23.30.145 reads in relevant part,

(b) If an employer fails to file timely notice of controversy or fails to pay compensation or medical and related benefits within 15 days after it becomes due or otherwise resists the payment of compensation or medical and related benefits and if the claimant has employed an attorney in the successful prosecution of the claim, the board shall make an award to reimburse the claimant for the costs in the proceedings, including a reasonable attorney fee. The award is in addition to the compensation or medical and related benefits ordered.

denied his claim for further TTD compensation. Before examining the evidence, the Board, in its decision, stated the law as follows: "We have also found that an employee bears the burden of proving whether or not he is disabled and the nature and extent of the disability. *Keyes v. Reeve Aleutian Airways*, AWCB No. 85–0312 at 12–13 (November 8, 1985)."

We conclude that the Board erred in this ruling.[3] We hold that the presumption of compensability in AS 23.30.120(a) applies when an employer controverts TTD compensation already awarded under AS 23.30.185.

The Alaska Workers' Compensation Act contains an express presumption of compensability. *See* AS 23.30.120(a).[4] Past decisions of this court have indicated that the presumption applies to TTD benefits. For example, in *Bailey v. Litwin Corp.*, 713 P.2d 249, 252 (Alaska 1986), we assumed that the presumption applied to a claim for continuing TTD, but explained that the employer had overcome the presumption. In *Kodiak Oilfield Haulers v. Adams*, 777 P.2d 1145, 1150 (Alaska 1989), a disabled worker sought reinstatement of TTD compensation, and the Board erroneously failed to apply the presumption to whether a work-related injury remained the source of an employee's continuing disability when an intervening injury occurred. There, however, the failure to apply the presumption was harmless error. Most recently, in *Wien Air Alaska v. Kramer*, 807 P.2d 471 (Alaska 1991), we applied the statutory presumption to a claim of continuing disability in the temporary total disability context, specifically concluding that the presumption applied to the question of whether a compensable disability existed. In *Municipality of Anchorage v. Carter*, 818 P.2d 661, 665 (Alaska 1991), where we applied the presumption to a claim for continuing care under AS 23.30.095(a), we stated, "Moreover, the text of AS 23.30.120(a) indi-

cates that the presumption of compensability is applicable to any claim for compensation under the workers' compensation statute."

The presumption shifts only the burden of production, not the burden of proof. *Wien Air*, 807 P.2d at 474 n. 4; *Kodiak Oilfield Haulers*, 777 P.2d at 1150. In accord with *Bailey*, we hold that an employee presumptively remains temporarily totally disabled unless and until the employer introduces "substantial evidence" to the contrary. *See* 713 P.2d at 252, 254. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that TTD is either not indicated, or not indicated as the employee contends. *Id.* at 252 n. 7 (quoting *Miller v. ITT Arctic Services*, 577 P.2d 1044, 1046 (Alaska 1978)). Each party must then carry the burden of persuasion on its claim without aid of any presumption or construction in favor or against recovery. *See Carter* at 667 (citing 1988 SLA ch. 79 § 1(b)); *see also Bailey*, 713 P.2d at 252.

Since the Board erred in its preliminary allocation of the burden of production, the issue must be remanded to the Board for redetermination. *See Carter*, at 666 n. 14. In so doing, we do not decide whether the Board's failure to apply the presumption of AS 23.30.120(a) is harmless error since the Board also erroneously defined temporary total disability.

### B. *Defining Temporary Total Disability*

The Board, citing *Vetter v. Alaska Workmen's Comp. Board*, 524 P.2d 264, 266 (Alaska 1974), defined disability as the "loss of earning capacity related to [a medical] impairment." The Board, quoting language from *Bailey*, 713 P.2d 249, 254, n. 12 (Alaska 1986), defined total temporary disability as "incapable of performing any

---

**3.** We exercise *de novo* review on this issue. *Miller v. ITT Arctic Services*, 577 P.2d 1044, 1046 (Alaska 1978).

**4.** That statute provides in part, "In a proceeding for the enforcement of a claim for compensa-

tion under this chapter it is presumed, in the absence of substantial evidence to the contrary, that (1) the claim comes within the provisions of this chapter...."

kind of work." The Board found "the capability of performing work, rather than actual receipt of wages" ends the right to receive TTD compensation.

■ Olson contests the Board's definition of TTD. He contends that "[t]he question is whether or not there is steady work and is it readily available." Using this test, Olson maintains that AIC/Martin did not offer substantial evidence that work is readily available to him as a retread shop manager, given his physical limitations. AIC/Martin, in contrast, defines the test of temporary total disability as whether "(1) the employee is medically stationary and (2) whether he can perform any work." We hold that the ability to perform any kind of work does not determine whether temporary total disability has ended. Rather, on remand, the Board must consider Olson's earning potential and the availability of employment.

The Alaska Worker's Compensation Act does not define temporary total disability. This court enunciated a definition of TTD in *Bailey v. Litwin Corp.*, 713 P.2d 249 (Alaska 1986), which the Board relied upon. *Bailey* stands for the proposition that "medical stability" is irrelevant in determining cessation of TTD benefits if the employee has returned to work. *Bailey*, 713 P.2d at 253. *Bailey* held that the claimant's return to work was "sufficient evidence to rebut the presumption of continuing compensability for temporary total disability." *Id.* at 254. A footnote explained, "Temporary disability may be total (incapable of performing *any* kind of work), or *partial* (capable of performing *some* kind of work)." *Id.* at 254 n. 12 (quoting *Huston v. Workers' Compensation Appeals Bd.*, 95 Cal.App.3d 856, 868, 157 Cal.Rptr. 355, 362 (Cal.App.1979) (emphasis in original)).

Despite this footnote in *Bailey*, we have never indicated that obtaining "any" work terminates an employee's right to TTD benefits. In *Bailey*, the employee had already returned to work and was making more than he had before his injury.[5] In *Phillips Petroleum Co. v. Alaska Industrial Bd.*, 17 Alaska 658, 667 (D.Alaska 1958), a case cited by the Board, the territorial district court held, "there is recognized the rule in practically all jurisdictions that the ability of an employee to engage in 'light or occasional' work does not negative a finding that the employee is entitled to total compensation." (Citations omitted.)

Recently, in *Wien Air Alaska v. Kramer*, we stated, "loss of earning capacity is the defining characteristic of a compensable disability." 807 P.2d 471, 474 (Alaska 1991) (citing *Hewing v. Peter Kiewit & Sons*, 586 P.2d 182, 185–86 (Alaska 1978)). *See also* 2 A. Larson, *Workmen's Compensation*, § 57.00, at 10–1 (Desk Ed.1990) ("Total disability may be found, in spite of sporadic earnings, if the claimant's physical condition is such as to disqualify him for regular employment in the labor market."); *New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031, 1038 (5th Cir.1981) ("Total disability may be economic as well as medical. It is therefore possible under [the Longshoremen's and Harbor Workers' Compensation Act] for an individual to be totally disabled 'when physically capable of performing certain work but otherwise unable to secure that particular kind of work.'" (citations omitted)); *Newport News Shipbuilding & Dry Dock Co. v. Director, Office of Workers' Comp. Programs, United States Dep't of Labor*, 592 F.2d 762, 765 (4th Cir.1979) ("We think the employer must demonstrate that 'there [are] jobs available in the local economy which the claimant, considering his age,

---

5. Bailey received TTD benefits from November 1980 until July 1981. He sought continued TTD benefits between July 1981 and May 1982. Although employed, he argued that he was eligible for TTD benefits because he was not medically stable as of July 1981, his medical condition prevented him from working full-time, and he was being retrained in instrumentation. *Bailey*,

713 P.2d at 252. However, from July 7, 1981 through May 7, 1982, Bailey worked a total of 1170 hours and earned over $36,000, making more on a weekly average than he was making in 1980 before he was injured. *Id.* at 251. Consequently, we held that "the Board did not err in focusing on Bailey's employment" when denying continued TTD benefits. *Id.*, at 253.

past experience and disability, [is] capable of performing.' " (citation omitted)).

Incorporated into this idea is the concept of steady and readily available employment. In *Hewing v. Alaska Workmen's Comp. Bd.*, 512 P.2d 896, 900 (Alaska 1973), we reviewed a claim for permanent partial disability and said, "The availability of work in the employee's community which he can perform in his injured condition is an important determinant of earning capacity." (Footnote omitted). In *Phillips Petroleum Co.*, the district court recognized that "the fact of occasional earnings is not quite so important as the physical condition of the employee to earn income with a degree of regularity." 17 Alaska at 669. *See also J.B. Warrack Co. v. Roan*, 418 P.2d 986, 988 (Alaska 1966) (total disability in determining permanent total disability "is the inability because of injuries to perform services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist" (footnote omitted)).

◼ The Board fails to indicate that employment opportunities exist for Olson as a tire retread shop manager given his physical limitations. It concludes that Olson was not "incapable of performing any kind of work," emphasizing Olson's employment at his father's shop, although the Board acknowledged that he did not receive a wage. However, Olson's employment for his father does not mean his TTD benefits should cease. *See Heironymus v. Jacobsen Transfer*, 215 Neb. 209, 337 N.W.2d 769 (1983) (injured truckdriver was totally disabled even through she was her husband's bookkeeper because there was no indication that she could perform this service for anyone but her husband).

The need to look at whether steady readily available work exists has as its rationale "a desire to encourage, or at least not penalize, commendable efforts by the claimant to rehabilitate himself." 2 A. Larson, *Workmen's Compensation*, § 57.51, at 10–62 (Desk Ed.1990). Professor Larson continues, "Since what is being tested under the odd-lot doctrine is claimant's ability

to command regular income as the result of his personal labor, it is plain that income from a business owned by the claimant, even though he contributes some work to it, should not be used to reduce disability." Larson, *supra*, § 57.51, at 10–62. *See also Bertsch v. Varnum Lumber & Fuel Co.*, 303 Minn. 545, 228 N.W.2d 228 (1975) (injured worker's opening of an upholstery business did not reduce a total to a partial disability); *Connolly v. Workmen's Comp. App. Bd.*, 8 Pa.Cmwlth. 99, 301 A.2d 109 (1973) (fact that injured worker bought employer's business and spent four hours per day managing and conversing with customers did not mean total disability had ceased). As Professor Larson finally states,

> Under the odd-lot doctrine, which is accepted in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, *undistorted by such factors as* business booms, *sympathy of a particular employer or friends*, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.

Larson, *supra*, § 57.51, at 10–53 (emphasis added). Therefore, the Board's termination of TTD because Olson was capable of performing any work, regardless of availability of employment, was error.

## II. VOCATIONAL REHABILITATION BENEFITS

◼ The Board found that Olson was not entitled to a vocational rehabilitation plan because he had the ability to return to "suitable gainful employment," as a tire retread or tire repair shop manager. Olson essentially contends that these jobs fall outside of his physical limitations and represent a loss of post injury earning capacity.

Review of the Board's factual findings is limited to determining "whether the

board's findings are supported by substantial evidence in light of the whole record." *Bailey,* 713 P.2d at 252 (citations omitted).

AS 23.30.265(28),[6] defines suitable gainful employment:

'Suitable gainful employment' means employment that is reasonably attainable in light of an individual's age, education, previous occupation, and injury, and that offers an opportunity to restore the individual as soon as practical to a remunerative occupation and as nearly as possible to the individual's gross weekly earnings as determined at the time of injury.

Our review of the record persuades us that there existed substantial evidence to support the Board's conclusion. We thus affirm the Board's determination that Olson was not entitled to a vocational rehabilitation plan. In this regard, the Board said,

Tydings concluded work as a tire retread or tire repair shop manager represented suitable gainful employment. We agree with that conclusion. Based on the vocation rehabilitation consultant's testimony, we find that as a beginning tire repair shop manager the employee might earn $288.00 to $485.00 a week, earnings rising to $769.00 a week with experience. Based on Settle's testimony, we find that as a tire retread shop manager the employee could currently earn $380.00 to $510.00 a week. Those rates of pay are less than the $796.00 gross weekly earnings at time of injury. However, we must also consider other factors. The vast majority of the employee's work experience involves similar work in tire repair and retreading. The employee also has only a high school education. The employee is currently fully qualified for positions as a shop manager and could, over time, approach the level of wages he obtained during his short period of employment as a tireman. We conclude that, considering all the factors, the positions of tire retread shop manager and tire repair shop manager

constitute suitable gainful employment available to the employee without a vocational rehabilitation plan. We conclude the employee is not entitled to a vocational rehabilitation plan even if he could not return to work as a heavy duty tireman.

Tydings testified at the hearing that Olson would not reach a comparable wage any quicker as an auto service technician. Olson acknowledged that he has specialized training from on-the-job work in "all areas of tire repair and manufacture." In any event, by February 23, 1988, Olson had returned to suitable gainful employment, testifying that he wanted to remain in his present position.

## III. MEDICAL BENEFITS

The Board denied Olson continuing medical benefits other than for a torn rotator cuff. It found by a preponderance of evidence that Olson's cervical spine was not damaged so severely that any continuing pain could be attributed to the 1985 injury. The Board also "received no evidence linking any current carpal tunnel syndrome or leg numbness to the 1985 injury." The Board said, "Employee has the burden of proving the need for the treatment by a preponderance of the evidence."

We have held that medical benefits are part of a compensation award within the meaning of the Workers' Compensation Act. *Moretz v. O'Neill Investigations,* 783 P.2d 764, 766 (Alaska 1989). As mentioned above, the presumption of compensability applies to continuing medical care. *Carter,* at 665.

In deciding whether the presumption of compensability applies to a claim, the Board must determine whether the employee has established some "preliminary link" between the alleged disability and the employment. *See, e.g., Burgess Const. Co. v. Smallwood,* 623 P.2d 312, 316 (Alaska 1981) ("there must be some evidence that the claim arose out of, or in the course of, employment before the presumption arises"). We have emphasized, however,

**6.** The Alaska Workers' Compensation Act was amended significantly in 1988. The 1988 amendments apply only to injuries sustained on or after July 1, 1988. Since Olson was injured in July 1985, the former law applies.

that this threshold showing is minimal, and requires only that an employee adduce some evidence that the claim arose out of his employment. *Cheeks v. Wismer & Becker/G.S. Atkinson,* 742 P.2d 239, 244 (Alaska 1987); *see also Kessick v. Alyeska Pipeline Service Co.,* 617 P.2d 755, 758 (Alaska 1980) (doubts regarding inconclusive but uncontroverted medical testimony resolved in claimant's favor).

Given that the Board failed to apply the presumption, the question is whether such error was harmless. The superior court found,

> The testimony of both doctors established the lack of carpal tunnel syndrome and the lack of further cervical spine problems. Even if the Board's decision initially placing the burden of proof on the employee was error, it was harmless because, as a matter of law, the evidence relied on by the Board was sufficient to overcome a presumption of compensability and considering the record as a whole was substantial evidence to support the Board's conclusion that the only medical benefits for which the employee is entitled are benefits for the torn rotator cuff.

■ However, our examination of the record indicates a remand of this issue to the Board is necessary. Evidence existed, for example, acknowledging the carpal tunnel syndrome and leg numbness and linking it to Olson's 1985 injury. The Objective Medical Assessments Corporation said, "It is possible that the carpal tunnel syndrome is related to the industrial injury of record." Dr. Klein stated that he felt the 1985 industrial accident was "a substantial factor in [Olson's] current medical condition." Olson himself linked his shoulder pain, shooting arm pain, numb hands, upper back pain and neck pain to his accident.

After this link was established, AIC/Martin needed to provide substantial evidence that the medical conditions were not related to the 1985 injury. "A party may overcome the presumption of compensability either by presenting affirmative evidence that the injury is not work-connected or by eliminating all possibilities

that the injury was work-connected." *Veco, Inc. v. Wolfer,* 693 P.2d 865, 872 (Alaska 1985) (citing *Fireman's Fund American Insurance Cos. v. Gomes,* 544 P.2d 1013 (Alaska 1976)). Only then would the burden of persuasion return to Olson.

In our view, the record contains enough ambiguity as to whether the presumption would have changed the outcome to require a remand on these issues.

## IV. ATTORNEY'S FEES

The Board stated,

> We find the employee retained an attorney who successfully defeated the employer's claim for a weekly compensation rate decrease of $330.71 which, if found, would have amounted to an overpayment of approximately $44,000.00. However, because the employee did not initially request an attorney's fee under AS 23.-30.145(b), we have no documentation of services rendered to defeat the employer's claim. The employee shall therefore submit to the employer documentation of fees and costs incurred on the compensation rate issue. The employer shall pay a reasonable fee and reimburse costs under AS 23.30.145(b) and 8 AAC 45.180. We retain jurisdiction to resolve disputes over reasonableness of the requested fees and costs.

Olson maintains that statutory attorney's fees under AS 23.30.145(a) should have been awarded, instead of reasonable attorney's fees under AS 23.30.145(b). AIC/Martin argues that the Board specifically retained jurisdiction to resolve the attorney fee question, and the superior court properly agreed the issue was not ripe for review. AIC/Martin also claims that Olson did not appeal that issue, and therefore it was not preserved.

■ The issue is properly before this court. The Board rendered a final decision on the issue on June 16, 1989. The superior court, while unable to review the actual fee award, did decide that the Board's decision to apply AS 23.30.145(b) was not manifestly unreasonable or error as a matter of law. Olson's statement of points on appeal indicate that he was appealing the applica-

tion of AS 23.30.145(b). Hence, this issue of law was preserved and is properly before this court.

The Board did not err in applying AS 23.30.145(b). The Board stated, "We find the employer, by seeking a compensation rate decrease and alleging an overpayment of compensation, 'otherwise resist[ed] the payment of compensation.' AS 23.30.145(b)." Moreover, AS 23.30.145(a) requires that compensation be "awarded": "the fees may be allowed only on the amount of compensation controverted and awarded." Here there was no award, rather Olson defeated the employer's claim for a weekly compensation decrease. Therefore, the Board did not abuse its discretion in awarding fees pursuant to AS 23.30.-145(b) in regard to Olson's successful defense of AIC/Martin's claim for a weekly rate decrease. *See Wien Air Alaska v. Arant*, 592 P.2d 352, 366 (Alaska 1979).

## CONCLUSION

The decision of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED with instructions to REMAND to the Board for further proceedings consistent with this opinion.